UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BERMAN DEVALERIO & PEASE LLP, BERMAN DEVALERIO PEASE & TABACCO P.C. and BURT & PUCILLO LLP, as general partners in BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO, <br><br> Plaintiffs, <br><br> v. <br><br> ERAN RUBINSTEIN and SUSAN M. BOLTZ RUBINSTEIN, <br><br> Defendants and Plaintiffs-in-Counterclaim, <br><br> v. <br><br> BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO, BERMAN DEVALERIO & PEASE, LLP, BERMAN DEVALERIO PEASE & TABACCO PC, BURT & PUCILLO LLP, GLEN DEVALERIO, NORMAN BERMAN, PETER PEASE, JEFFREY BLOCK, LESLIE STERN, KATHLEEN DONOVAN-MAHER, MICHAEL LANGE, PATRICK EGAN, WENDY H. ZOBERMAN, NICOLE LAVALEE, JOSEPH TABACCO, CHRISTOPHER HEFFELFINGER, C. OLIVER BURT, MICHAEL J. PUCILLO AND TODD A. SEAVER, <br><br> Defendants-in-Counterclaim. | CIVIL ACTION NO. 07-CV-12127 (PBS) |

## ANSWER AND COUNTERCLAIM

Pursuant to Fed. R. Civ. P. 8, defendants Eran Rubinstein and Susan M. Boltz Rubinstein (the "Rubinsteins") respond to the Corrected Amended Complaint filed by the plaintiffs Berman DeValerio & Pease LLP, Berman DeValerio Pease & Tabacco PC and Burt & Pucillo LLP, as purported general partners in Berman DeValerio Pease Tabacco Burt & Pucillo as follows:

## INTRODUCTION

1.      No response is required to Paragraph 1 of the Corrected Amended Complaint which merely purports to characterize the action and to summarize the plaintiffs' alleged claims against the defendants.  To the extent that any response is deemed to be required, the Rubinsteins deny the plaintiffs' allegations and characterizations and call upon the plaintiffs to prove the same.  Answering further, the Rubinsteins deny that Berman DeValerio Pease Tobacco Burt & Pucillo ("BD") is registered to do business in Boston, i.e., it does not possess a certificate to do business, and deny, upon information and belief, that the three entities described in paragraph one are general partners of BD. See Exhibit A attached.  Answering further, the Rubinsteins were informed and believe at or about the time that they entered into the Agreement at issue that BD was a law firm consisting of the three offices listed on the firm's letterhead and that the individuals listed in the Counterclaim were partners of BD.  The Rubinsteins admit that the Agreement provided for them to perform institutional outreach to communicate with and secure clients for BD's international investor portfolio monitoring program, and deny any characterizations in the last sentence of Paragraph 1 which is otherwise inconsistent with the Agreement.

2.      The Rubinsteins admit that they terminated their relationship with BD after approximately five months based upon BD's breach of the contract, including its breach of the implied covenant of good faith and fair dealing implied by law.  The Rubinsteins admit that they rejoined the Coughlin firm where they had previously been employed, and that, among other regions, the Coughlin firm maintains offices in California and New York.  The Rubinsteins deny the remaining characterizations of the Coughlin firm in the first sentence of Paragraph 2 of the Corrected Amended Complaint.  The Rubinsteins admit that they subsequently became associated with the Chitwood firm which has offices in Atlanta, Georgia and New York.  The

Rubinsteins deny the remaining characterizations of the Chitwood firm in the second sentence of Paragraph 2 of the Corrected Amended Complaint.

3.      The Rubinsteins deny the allegations contained in Paragraph 3 of the Corrected Amended Complaint.

## PARTIES

4.      The Rubinsteins admit, on information and belief, that Berman DeValerio and Pease, LLP is a Massachusetts limited liability partnership.  The Rubinsteins deny, on information and belief, the allegations contained in the second sentence of this paragraph. Further answering, the Rubinsteins were informed and believed at or about the time they entered into the Agreement at issue that BD was a general partnership with the three offices listed on the firm's letterhead and that the individuals listed in the Counterclaim were the firm's partners.  The Rubinsteins only subsequently learned that, upon information and belief, BD is not registered to do business in the City of Boston.  See Exhibit A attached.

5.      The Rubinsteins admit, on information and belief, that Berman DeValerio Pease & Tabacco, P.C. is a California professional corporation with an address set forth in Paragraph 5 of the Corrected Amended Complaint.  On information and belief, the Rubinsteins deny the allegations contained in the second sentence of this paragraph.

6.      The Rubinsteins admit, on information and belief, that Burt & Pucillo LLP is a Florida limited liability partnership with an office address set forth in the first sentence of Paragraph 6 of the Corrected Amended Complaint.  On information and belief, the Rubinsteins deny the allegations contained in the second sentence of this paragraph.

7.      The Rubinsteins were informed and believed at or about the time they entered into the Agreement at issue that BD was a general partnership with the three offices listed on the firm's letterhead and that the individuals listed in the Counterclaim were the firm's partners.  The

Rubinsteins only subsequently learned that, upon information and belief, BD is not registered to do business in the City of Boston.  See Exhibit A attached.

8.      The Rubinsteins admit the allegations contained in Paragraph 8 of the Corrected Amended Complaint.

9.      The Rubinsteins admit the allegations contained in Paragraph 9 of the Corrected Amended Complaint.

## STATEMENT OF FACTS

10.     The Rubinsteins admit the allegations contained in the first three sentences and the last sentence of Paragraph 10 of the Corrected Amended Complaint.  The fourth and fifth sentences of this paragraph characterize the Corrected Amended Complaint and do not contain factual allegations to which a response is required.  The Rubinsteins admit that their initial agreement with Lerach Coughlin expired in March 2007.

11.     The Rubinsteins admit that they contacted BD after their agreement with the Coughlin firm expired to discuss the possibility of becoming associated with BD.  The Rubinsteins deny the remaining allegations and characterizations contained in Paragraph 11 of the Corrected Amended Complaint.  Further answering, the Rubinsteins state that, among other things, they discussed their accomplishments in terms of client base and contacts with BD and represented that they had pre-existing commitments from international clients that were not dependent on their employment by or affiliation with any particular law firm.  Further answering, the Rubinsteins parted amicably with the Coughlin firm in March, 2007 and did not disparage the Coughlin firm to BD.

12.     The Rubinsteins admit that they met with representatives of BD in Boston and New York and negotiated an "of counsel" relationship and that the parties entered into an

Agreement dated as of March 26, 2007.  The Rubinsteins deny the remaining allegations contained in Paragraph 12 of the Corrected Amended Complaint.

13.     The Rubinsteins state that the Agreement described in Paragraph 13 of the Corrected Amended Complaint is a document of independent legal significance which speaks for itself.  To the extent that the allegations contained in Paragraph 13 of the Corrected Amended Complaint mischaracterize or in any way differ from the terms and conditions of the Agreement, those allegations are denied.

14.     The Rubinsteins deny the allegations contained in Paragraph 14 of the Corrected Amended Complaint.  Further answering, BD failed and refused to supply the Rubinsteins with appropriate marketing materials, took several months to include the Rubinsteins' complete profiles and photographs on their website and ultimately failed to register to do business in New York and never legitimately established a New York office.  Instead, BD suggested on several occasions that the Rubinsteins register a limited liability company in their name in New York for the benefit of BD so that BD could "stay under the radar" in New York to avoid past, current, and future tax payments.  The firm further stated that the offices in Boston, San Francisco and West Palm Beach had entered into similar arrangements.

15.     The Rubinsteins deny the allegations contained in Paragraph 15 of the Corrected Amended Complaint.

16.     The Rubinsteins admit that they received the $25,000 monthly payments set forth in the Agreement for the months of April through September 2007.  The Rubinsteins deny that they "demanded" these payments.  The Rubinsteins admit that they were properly reimbursed for business expenses as set forth in the Agreement.

17.     The Rubinsteins admit the allegations contained in Paragraph 17 of the Corrected Amended Complaint.  Further answering, the Rubinsteins state that they were reimbursed for expenses approved by BD.

18.     The Rubinsteins deny the allegations contained in Paragraph 18 of the Corrected Amended Complaint.  Answering further, the Rubinsteins admit that BD paid the invoices in question but deny that they insisted on or in any way inappropriately influenced BD to make these payments.  Upon information and belief, Plaintiffs continue to use the services of MeetChinaBiz.

19.     The Rubinsteins deny the allegations contained in Paragraph 19 of the Corrected Amended Complaint.  Further answering, the Rubinsteins state that the Coughlin firm invited them to rejoin the firm in or about July, 2007, and that the Rubinsteins informed BD in writing of that fact.  The Rubinsteins informed the Coughlin firm in July that they would not return to work for the Coughlin firm at that time.

20.     The Rubinsteins deny the allegations contained in Paragraph 20 of the Corrected Amended Complaint.

21.     The Rubinsteins admit the allegations contained in the first two sentences in Paragraph 21 of the Corrected Amended Complaint.  To the extent that BD alleges that the Rubinsteins interfered with or prevented BD from implementing certain monitoring agreements, such allegations are denied.  In fact, in late June the Rubinsteins suggested that Leslie Stern, who heads the BD case evaluation and monitoring team, participate in a phone conference with a client to assist in the implementation of a monitoring agreement.  Ms. Stern was unable to understand key monitoring data issues and appeared unwilling to engage in a discussion of same unless an explanation of the issue was given to her in writing to provide to BD's outside vendor.

Glen DeValerio later stated to the Rubinsteins that Ms. Stern was "mystified" by issues that would arise in the portfolio monitoring process.

22.     The Rubinsteins admit the allegations contained in the first sentence in Paragraph 22 of the Corrected Amended Complaint.  The Rubinsteins deny the remaining allegations contained in Paragraph 22 of the Corrected Amended Complaint.

23.     The Rubinsteins admit that BD partners periodically asked for information concerning their outreach efforts while "of counsel" at BD, and they state that they provided such information to BD.  The Rubinsteins deny the remaining allegations in the first and second sentences of Paragraph 23 of the Corrected Amended Complaint.  Answering further, the Rubinsteins state that they did provide meaningful information to BD, which the firm acknowledged.  Some examples include, but are not limited to, the following:  Kathleen Donovan Maher, the BD partner with whom they were coordinating wrote in an April 2, 2007 email to the Rubinsteins:  "Thank you both for the level of detail in your update. Everyone is very impressed and appreciative."  This same partner made continued efforts to prevent the Rubinsteins from sharing information from head partner Glen DeValerio and the rest of the BD's partners.  Additional examples of updates of client development efforts included:  emails to Norman Berman on June 6, June 8 and on July 11th; emails to Glen DeValerio and Norman Berman on May 9 and June 29.  In response to the July 11th update, Mr. Berman replied, on July 12:  "That's excellent news."  On July 22, the Rubinsteins emailed a memo describing their client development efforts to Glen DeValerio.  The Rubinsteins state that the Agreement referenced in the third sentence of Paragraph 23 of the Corrected Amended Complaint is a document of independent legal significance which speaks for itself and, to the extent that the allegations contained in Paragraph 23 mischaracterize or in any way differ from the terms and

conditions of the Agreement, those allegations are denied.  The Rubinsteins deny the remaining allegations contained in sentences four through six of Paragraph 23 of the Amended Complaint.

24.     The Rubinsteins deny the allegations contained in Paragraph 24 of the Corrected Amended Complaint.

25.     The Rubinsteins deny the allegations contained in the first sentence of Paragraph 25 of the Corrected Amended Complaint.  The Rubinsteins admit that they sent the emails contained in the second and third sentences of Paragraph 25 of the Corrected Amended Complaint, but deny the remaining allegations contained in Paragraph 25 of the Corrected Amended Complaint to the extent that they mischaracterize or in any way differ from the actual text of the emails.

26.     The Rubinsteins deny the allegations contained in Paragraph 26 of the Corrected Amended Complaint.

27.     The Rubinsteins deny the allegations contained in the first sentence of Paragraph 27 of the Corrected Amended Complaint.  Further answering, the Rubinsteins state that, despite BD's failure to establish a legitimate, registered New York office, BD's misrepresentation that they had a unique and superior in-house monitoring program and their failure to cooperate with the Rubinsteins so that they could successfully perform the Agreement, the Rubinsteins still attempted to produce institutional investor clients for BD.  The Rubinsteins deny the allegations contained in the second sentence of Paragraph 27 of the Corrected Amended Complaint as they mischaracterize the email referred to in that paragraph.

28.     The Rubinsteins admit that, at the end of August 2007, they requested that their monthly payment required under the Agreement be deposited into their account one day early, in advance of the Labor Day holiday weekend which began on Saturday, September 1st, which they were concerned would delay their receipt of their pay and cause it to be late by several days.  The

Rubinsteins deny that they "demanded" their compensation.  At the time of the request and at the time of receipt of the funds, the Rubinsteins were neither associated with another law firm, nor had they agreed to be associated with any other law firm.  The Rubinsteins admit that they informed BD in or about early September, 2007 that they were terminating the Agreement based on BD's material breach thereof.

29.     The Rubinsteins admit that they terminated their association with BD and returned to work for the Coughlin firm, but deny the remaining allegations contained in Paragraph 29 of the Corrected Amended Complaint.  Answering further, the Rubinsteins state that the clients at issue made their own decisions who they wanted to have as their lawyers and that the Rubinsteins did not engage in any improper conduct.

30.     The Rubinsteins admit the allegations contained in the first sentence of Paragraph 30, but only to the extent the clients terminated their monitoring agreements with BD.  The Rubinsteins deny the allegations contained in the second sentence of Paragraph 30.  The Rubinsteins admit the allegations contained in the last sentence in Paragraph 30.

31.     The Rubinsteins admit that two clients who had signed portfolio monitoring agreements with BD subsequently became represented by the Chitwood firm, but deny the remaining allegations contained in Paragraph 31 of the Corrected Amended Complaint.

## COUNT I

## BREACH OF CONTRACT

32.     The Rubinsteins repeat and incorporate by reference their responses to Paragraphs 1 through 31 of the Corrected Amended Complaint as if fully set forth herein.

33.     The Rubinsteins admit that they signed the Agreement, which speaks for itself. The Rubinsteins deny the allegations contained in the second sentence of Paragraph 33 of the Corrected Amended Complaint.

34.     The Rubinsteins deny the allegations contained in Paragraph 34 of the Corrected Amended Complaint.  Further answering, BD has substantially and materially breached the Agreement in several ways, including but not limited to the following:  (1) failing to establish a legitimate, registered New York office in the firm's name, (2) misrepresenting that they had a unique and superior in-house monitoring program, (3) failing to cooperate with the Rubinsteins so that they could successfully perform the Agreement, (4) deceiving and misleading the Rubinsteins as to the true characteristics and nature of Plaintiffs' law firm structure, and (5) implicating the Rubinsteins in Plaintiffs' attempts to "stay under the radar" of tax authorities.

35.     The Rubinsteins deny the allegations contained in Paragraph 35 of the Corrected Amended Complaint.

36.     The Rubinsteins deny the allegations contained in Paragraph 36 of the Corrected Amended Complaint.

37.     The Rubinsteins deny the allegations contained in Paragraph 37 of the Corrected Amended Complaint.

38.     The Rubinsteins deny the allegations contained in Paragraph 38 of the Corrected Amended Complaint.

## COUNT II

## PROCURING BREACH OF CONTRACT

39.     The Rubinsteins repeat and incorporate by reference their responses to Paragraphs 1 through 38 of the Corrected Amended Complaint as if fully set forth herein.

40.     Paragraph 40 states a legal conclusion to which no response is required.

41.     The Rubinsteins admit that BD entered into monitoring relationships with certain individuals or entities.  The Rubinsteins deny any remaining allegations contained in Paragraph 41 of the Corrected Amended Complaint.

GSDOCS\1816376

42.     The Rubinsteins admit that they were aware of certain monitoring relationships maintained by BD with certain individuals or entities.  The Rubinsteins deny any remaining allegations contained in Paragraph 42 of the Corrected Amended Complaint.

43.     The Rubinsteins deny the allegations contained in Paragraph 43 of the Corrected Amended Complaint.

**COUNT III**

**INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONS**

44.     The Rubinsteins repeat and incorporate by reference their responses to Paragraphs 1 through 43 of the Corrected Amended Complaint as if fully set forth herein.

45.     The Rubinsteins lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45 of the Corrected Amended Complaint.

46.     The Rubinsteins admit that they have limited knowledge concerning certain of BD's business relationships, but deny the remaining allegations contained in Paragraph 46 of the Corrected Amended Complaint.

47.     The Rubinsteins deny the allegations contained in Paragraph 47 of the Corrected Amended Complaint.

**COUNT IV**

**BREACH OF FIDUCIARY DUTY**

48.     The Rubinsteins repeat and incorporate by reference their responses to Paragraphs 1 through 47 of the Corrected Amended Complaint as if fully set forth herein.

49.     Paragraph 49 states a legal conclusion to which no response is required.  To the extent any such response is required, the Rubinsteins deny the allegations contained in Paragraph 49 of the Corrected Amended Complaint.

50.     The Rubinsteins deny the allegations contained in Paragraph 50 of the Corrected Amended Complaint.

GSDOCS\1816376

## COUNT V

## MONEY HAD AND RECEIVED

51.     The Rubinsteins repeat and incorporate by reference their responses to Paragraphs 1 through 50 of the Corrected Amended Complaint as if fully set forth herein.

52.     The Rubinsteins admit they were paid $150,000 as compensation under the terms of the Agreement and that they were reimbursed for expenses in the amount of $84,775 incurred in connection with their performance of services under the Agreement.  The Rubinsteins deny any remaining allegations contained in Paragraph 52 of the Corrected Amended Complaint.

53.     The Rubinsteins admit only that the sums were earned in accordance with the terms of the Agreement or were expenses which were otherwise approved by BD.  The Rubinsteins deny any other allegations contained in Paragraph 53 of the Corrected Amended Complaint.

54.     The Rubinsteins deny the allegations contained in Paragraph 54 of the Corrected Amended Complaint.

55.     The Rubinsteins deny the allegations contained in Paragraph 55 of the Corrected Amended Complaint.

## FIRST AFFIRMATIVE DEFENSE

Counts II and IV of the Corrected Amended Complaint fail to state claims upon which relief can be granted because Massachusetts law does not recognize claims for Procuring Breach of Contract (Count II) or Money Had And Received (Count V) under the circumstances of this case.

## SECOND AFFIRMATIVE DEFENSE

Count IV of the Corrected Amended Complaint, asserting a claim for Breach of Fiduciary Duty, fails to state a claim upon which relief may be granted because the Rubinsteins did not owe fiduciary duties to BD as a matter of law.

12

### THIRD AFFIRMATIVE DEFENSE

Based on its own conduct, BD is estopped from recovering on its Corrected Amended Complaint against the Rubinsteins.

### FOURTH AFFIRMATIVE DEFENSE

BD's claims are barred because of its own knowledge, acts and conduct, and/or because of the knowledge, acts and conduct of its principals, officers, agents and other representatives.

### FIFTH AFFIRMATIVE DEFENSE

The Plaintiffs lack standing to bring this action because BD is not a general partnership which possesses a certificate to do business in Boston, Massachusetts; thus, Berman DeValerio & Pease LLP, Berman DeValerio Pease & Tabacco, P.C. and Burt & Pucillo LLP cannot bring this action as purported general partners of BD.  If in the alternative, BD is a partnership comprised of the individual partners listed on the Counterclaim, as the Rubinsteins were informed and believed at or about the time they entered into the Agreement, the claim must be dismissed because a partnership cannot sue in its own name but only in the names of its partners, who have not brought the action at issue.

### SIXTH AFFIRMATIVE DEFENSE

The Rubinsteins were excused, as a matter of law, of their obligations under the Agreement because BD substantially and materially breached the Agreement and the covenant of good faith and fair dealing implied by law in the Agreement, in several ways, including but not limited to the following:  (1) failing to establish a legitimate, registered New York office, (2) misrepresenting that they had a unique and superior in-house monitoring program,  (3) failing to cooperate with the Rubinsteins so that they could successfully perform the Agreement, (4) deceiving and misleading the Rubinsteins as to the true characteristics and nature of Plaintiffs' law firm structure, and (5) attempting to implicate the Rubinsteins in the firm's attempts to "stay under the radar" of tax authorities.

## SEVENTH AFFIRMATIVE DEFENSE

This Court lacks jurisdiction over the Rubinsteins.

## EIGHTH AFFIRMATIVE DEFENSE

Venue is more appropriate in the Eastern District of Pennsylvania.

## NINTH AFFIRMATIVE DEFENSE

The Corrected Amended Complaint is barred by the doctrine of waiver.

## TENTH AFFIRMATIVE DEFENSE

BD may not recover on the Corrected Amended Complaint insofar as Paragraph 7 of the Agreement, which attempts to thwart the clients' ongoing relationships with the Rubinsteins following the Rubinsteins' departure from the firm, is void as against public policy.

WHEREFORE, the Rubinsteins respectfully request that this Court:

1. Dismiss the Plaintiffs' claims and enter judgment in the Rubinsteins' favor on all Counts of the Corrected Amended Complaint;

2. Award the Rubinsteins their fees and costs of defending this action;

3. Order such other and further relief as is just.

## JURY DEMAND

The Rubinsteins demand a trial by jury on all issues so triable as set forth the plaintiffs' Corrected Amended Complaint.

## COUNTERCLAIM

As and for their Counterclaim, Susan M. Boltz Rubenstein and Eran Rubenstein state as follows:

## PARTIES

1.      Plaintiff-in-Counterclaim, Susan M. Boltz Rubinstein ("Boltz"), is an adult individual who is an attorney licensed to practice law in the Commonwealth of Pennsylvania and in the State of New York, with a residence located at 3444 Wiltshire Road, Furlong, PA 18925.

2.      Plaintiff-in-Counterclaim, Eran Rubinstein ("Rubinstein"), is an adult individual who is an attorney licensed to practice law in the Commonwealth of Pennsylvania with a residence located at 3444 Wiltshire Road, Furlong, PA 18925.

3.      Defendant-in-Counterclaim, Berman DeValerio Pease Tabacco Burt & Pucillo ("BD"), is, on information and belief, a law firm comprised of three law firm entities, each entity operating a separate office of the law firm, one in Massachusetts at One Liberty Square, 8th Floor, Boston, MA 02109, one in Florida at Esperante Building, 222 Lakeview Avenue, Suite 900, West Palm Beach, FL 33401, and one in California at 425 California Street, Suite 2100, San Francisco, CA 94104.

4.      Defendant-in-Counterclaim, Berman DeValerio & Pease LLP ("BDP") is a limited liability partnership registered in the Commonwealth of Massachusetts, with its office at One Liberty Square, 8th Floor, Boston, MA 02109.  BDP represents itself and its personnel at all times as BD, with the possible exception of filings with the Secretary of State of Massachusetts and perhaps with tax authorities.  On information and belief, it does not present itself publicly as BDP.  Upon information and belief, Berman DeValerio & Pease LLP acts/has acted/purports to act as of counsel to Berman DeValerio Pease & Tabacco P.C.  Upon information and belief, neither Joseph Tabacco nor any principals or directors in the professional corporation of Berman DeValerio Pease & Tabacco are partners in Berman DeValerio & Pease LLP.

5.      Defendant-in-Counterclaim, Berman DeValerio Pease & Tabacco P.C. ("BDPT") is a California professional corporation registered in California, with its office at 425 California Street, Suite 2100, San Francisco, CA 94104.  On information and belief, BDPT represents itself and its personnel at all times as part of BD, with the possible exception of filings with the Secretary of State of California and perhaps filings with tax authorities.  On information and belief, it does not present itself publicly as BDPT.  Upon information and belief,  Berman

DeValerio Pease & Tabacco P.C. acts/has acted/purports to act as of counsel to  Berman DeValerio & Pease LLP.  Upon information and belief, Norman Berman, Glen DeValerio and Peter Pease are not principals or directors in Berman DeValerio Pease & Tabacco P.C.

6.      Defendant-in-Counterclaim, Burt & Pucillo LLP ("B&P"), is a limited liability partnership registered in the State of Florida, with its office at Esperante Building, 222 Lakeview Avenue, Suite 900, West Palm Beach, FL 33401.  On information and belief, B&P represents itself and its personnel at all times as BD, with the possible exception of filings with the Secretary of State of Florida and perhaps filings with tax authorities.  On information and belief, it does not present itself publicly as B&P.

7.      Oliver C. Burt and Michael J. Pucillo, partners in B&P, are the owners of the registered fictitious name of BD in West Palm Beach, Florida.

8.      Page two of the application by B&P for the registered fictitious name dated December 20, 2007 notes the full firm name of Berman DeValerio Pease Tabacco Berman & Pucillo and references eleven individuals as a "partner list to application," including Norman Berman (with his office address in Massachusetts), Peter Pease (with his office address in Massachusetts), Jeffrey Block (with his office address in Massachusetts), Michael Lange (with his office address in Massachusetts), Glen DeValerio (with his office address in Massachusetts), Kathleen Donovan-Maher (with her office address in Massachusetts), Wendy H. Zoberman (with her office address in Florida), R. Scott Palmer (with his office address in Florida), Nicole Lavalee (with her office address in California), Joseph Tabacco (with his office address in California), and Christopher T. Heffelfinger (with his office address in California).

9.      Defendant-in-Counterclaim, Berman, is an adult individual who is an attorney licensed to practice law in the Commonwealth of Massachusetts and the state of Connecticut, with a residence at 12 Beechcroft Road, Newton, MA 02339 and a regular office and place of

business located at One Liberty Square, 8th Floor, Boston, MA 02109.  At or about the time the Rubinsteins entered into the Agreement, it was their information and belief that Berman was also a partner in BD.

10.     Defendant-in-Counterclaim, DeValerio, is an adult individual who is an attorney licensed to practice law in the Commonwealth of Massachusetts, with a residence at 670 East Shore Road, Jamestown, RI 02835 and a regular office and place of business located at One Liberty Square, 8th Floor, Boston, MA 02109.  At or about the time the Rubinsteins entered into the Agreement, it was their information and belief that DeValerio was also a partner in BD.

11.     Defendant-in-Counterclaim, Maher, is an adult individual who is an attorney licensed to practice law in the Commonwealth of Massachusetts, with a residence at 232 Old School House Road, Hanover, MA 02339 and a regular office and place of business located at One Liberty Square, 8th Floor, Boston, MA 02109.  At or about the time the Rubinsteins entered into the Agreement, it was their information and belief that Maher was also a partner in BD.

12.     Defendant-in-Counterclaim, Pease, is an adult individual who is an attorney licensed to practice law in the Commonwealth of Massachusetts, with a regular office and place of business located at One Liberty Square, 8th Floor, Boston, MA 02109.  At or about the time the Rubinsteins entered into the Agreement, it was their information and belief that Pease was also a partner in BD.

13.     Defendant-in-Counterclaim, Block, is an adult individual who is an attorney licensed to practice law in the Commonwealth of Massachusetts and the State of New York, with a regular office and place of business located at One Liberty Square, 8th Floor, Boston, MA 02109.  At or about the time the Rubinsteins entered into the Agreement, it was their information and belief that Block was also a partner in BD.

GSDOCS\1816376

14.     Defendant-in-Counterclaim, Stern, is an adult individual who is an attorney licensed to practice law in the Commonwealth of Massachusetts and the State of New York, with a regular office and place of business located at One Liberty Square, 8th Floor, Boston, MA 02109.  At or about the time the Rubinsteins entered into the Agreement, it was their information and belief that Stern was also a partner in BD.

15.     Defendant-in-Counterclaim, Lange, is an adult individual who is an attorney licensed to practice law in the Commonwealth of Massachusetts with a residence and/or business address at 70 Gray Cliff Road, Newton, MA 02459.  At or about the time the Rubinsteins entered into the Agreement, it was their information and belief that Lange was also a partner in BD.

16.     Defendant-in-Counterclaim, Egan, is an adult individual who is an attorney licensed to practice law in the Commonwealth of Massachusetts, the State of New York, and the State of Connecticut with a regular office and place of business located at One Liberty Square, 8th Floor, Boston, MA 02109.  At or about the time the Rubinsteins entered into the Agreement, it was their information and belief that Egan was also a partner in BD.

17.     Defendant-in-Counterclaim, Zoberman, is an adult individual who is an attorney licensed to practice law in the state of Florida with a regular office and place of business located at 222 Lakeview Ave., Suite 900, West Palm Beach, FL 33401.  At or about the time the Rubinsteins entered into the Agreement, it was their information and belief that Zoberman was also a partner in BD.

18.     Defendant-in-Counterclaim, Lavalee, is an adult individual who is an attorney licensed to practice law in the state of California with a residence at 308 Tanner Heights Drive, Santa Cruz, CA 95060 and a regular office and place of business located at 425 California Street, Suite 2100, San Francisco, CA 94104.  At or about the time the Rubinsteins entered into the Agreement, it was their information and belief that Lavalee was also a partner in BD.

19.     Defendant-in-Counterclaim, Tabacco, is an adult individual who is an attorney licensed to practice law in the state of California, Massachusetts, New York, and the District of Columbia with a residence at 135 Bear Gulch Drive, Portola Valley, CA 94028 and place of business located at 425 California Street, Suite 2100, San Francisco, CA 94104.  At or about the time the Rubinsteins entered into the Agreement, it was their information and belief that Tabacco was also a partner in BD.

20.     Defendant-in-Counterclaim, Heffelfinger, is an adult individual who is an attorney licensed to practice law in the state of California with a place of business located at 425 California Street, Suite 2100, San Francisco, CA 94104.  At or about the time the Rubinsteins entered into the Agreement, it was their information and belief that Heffelfinger was also a partner in BD.

21.     Defendant-in-Counterclaim, Burt, is an adult individual who is an attorney licensed to practice law in the state of Florida with a regular office and place of business located at 222 Lakeview Ave., suite 900, West Palm Beach, FL 33401.  At or about the time the Rubinsteins entered into the Agreement, it was their information and belief that Burt was also a partner in BD.

22.     Defendant-in-Counterclaim, Pucillo, is an adult individual who is an attorney licensed to practice law in the state of Florida with a regular office and place of business located at 222 Lakeview Ave., suite 900, West Palm Beach, FL 33401.  At or about the time the Rubinsteins entered into the Agreement, it was their information and belief that Pucillo was also a partner in BD.

23.     Defendant-in-Counterclaim, Seaver, is an adult individual who is an attorney licensed to practice law in the states of New Hampshire and Massachusetts with a place of business located at 425 California Street, Suite 2100, San Francisco, CA 94104.  At or about the

GSDOCS\1816376

time the Rubinsteins entered into the Agreement, it was their information and belief that Seaver was also a partner in BD.

## FACTS COMMON TO ALL COUNTS[1]

24.     At all times relevant to the Counterclaim, defendants-in-counterclaim acted by and through their authorized agents, servants, employees, principals, and/or representatives, who at all times acted within the course and scope of their duties and authority for and on behalf of defendants-in-counterclaim.  At all times herein BDP, BDPT, and B&P at least publicly comprised the law firm of  BD, and the actions and omissions of BD included authorized actions and omissions on behalf of BDP, BDPT, and B&P.

25.     The Rubinsteins are class action attorneys. They have worked in the class action industry for over six years on several high profile cases, first on the defense side, later on the plaintiffs' side. Over the last several years, a significant part of the services rendered by the Rubinsteins in addition to case work has been obtaining international institutional investors as clients to serve as lead plaintiffs in U.S. based securities class actions.  The Rubinsteins have been successful in their endeavors, have developed a good reputation in the business, and have become known as attorneys with a book of clients and contacts made up of international institutional investors.

26.     The Rubinsteins' client development efforts began in 2002. At that time, the Rubinsteins began to develop relationships with valuable contacts and clients. These efforts grew and accelerated over the next few years. The relationships that the Rubinsteins developed through substantial investments of time and money overseas were direct and personal ones that

---

[1] For ease of reference, the Rubinsteins shall refer to all defendants-in-counterclaim jointly as "BD".

were not dependent upon their affiliation or employment with any particular law firm or company.

27.     The Rubinsteins prior affiliation with the Lerach Coughlin law firm in California ended amicably on March 15, 2007.

28.     Before any contact with BD, two International clients committed to sign monitoring agreements to allow the Rubinsteins to act as monitoring and evaluation counsel on their behalf regardless of the Rubinsteins' law firm employment or affiliation. One of these clients scheduled a meeting with the Rubinsteins for a time in April, 2007, for the purpose of signing a monitoring agreement.

29.     One of the Rubinsteins' primary contacts substantially aiding them in their client development and outreach efforts overseas is/has been an agency in New York State ("NY State Agency"). While the Rubinsteins' contacts at this agency have been and are willing to continue working with them at whatever law firm they are employed by or affiliated with, as a New York State agency, they have been and are only able to continue to do so if such a law firm has a registered office for doing business in New York.

30.     The Rubinsteins' initial contact with the law firm of BD occurred on March 17, 2007, when Boltz sent an email to Maher, a partner in the firm's Boston office. During a phone conversation the next day, Rubinstein and Maher discussed the Rubinsteins' accomplishments in terms of client base and contacts. Among other things, they discussed pre-existing commitments from clients in several countries, all of which were not dependent on the Rubinsteins' employment by or affiliation with any particular law firm.

31.     During the March 18, 2007 phone conversation with Maher, Rubinstein explained to her that the Rubinsteins required two things as part of any contractual arrangement to assure continued commitment and loyalty of their clients and to continue effectively with their client

21

development efforts.  Rubinstein explained to Maher that the first of these was a law firm with an effective monitoring program, with personnel capable of understanding and working with data from international institutional investors and having the ability to provide the appropriate monitoring services. Maher assured Rubinstein that BD's in-house monitoring program was unique and superior and that its personnel were very experienced and superior as well.

32.     Rubinstein further explained to Maher that the second of these requirements was that the law firm must maintain a registered office in New York.  Rubinstein explained that international institutional investors want a New York presence for their legal representatives/law firms.  Rubinstein also explained that a very important contact of the Rubinsteins, the New York State agency, which was then aiding them in their international outreach efforts and client contact and development efforts, also required that the Rubinsteins only be associated with a law firm properly registered to do business in New York with a legitimate New York office.  Maher stated that this would not be a problem and that she would discuss this with her partners.

33.     Maher then coordinated the scheduling of a meeting in New York with two of her partners, Berman and Jeffrey Block ("Block"). The meeting was scheduled for March 19, 2007. However, a time was not finalized until very late morning because Maher was waiting to hear back from the two partners, who were in Manhattan attending a final approval hearing in another matter before Judge Hellerstein.

34.     The meeting with Berman and Block took place in New York on March 19, 2007, the Rubinsteins discussed their client development achievements.  During the meeting, the Rubinsteins specifically asked about BD's monitoring program, the capabilities of the program, and the abilities of the firm's monitoring personnel. The Rubinsteins again explained that the firm's having and providing a fully functioning monitoring program, with personnel capable of understanding and handling the data and needs of international clients, was a very important

prerequisite to the Rubinsteins' entering into a contractual relationship with BD.  Berman and Block assured the Rubinsteins that their in-house monitoring program and personnel were excellent.  Nothing was said about BD's past and intended future use of Verteris, an outsourced monitoring service, nor a generic version of Verteris.  The Rubinsteins also reiterated that it was also essential to any contractual relationship with BD that the law firm open and maintain a registered law office in Manhattan.  Berman and Block stated that this would be done.

35.     At the March 19, 2007 meeting in New York, the parties conducted contractual negotiations.  Per BD's earlier request, the Rubinsteins brought to the meeting their contract with their previous law firm to be used as a template for any contract between the Rubinsteins and BD. At the conclusion of the meeting, BD stated that they could utilize the Rubinsteins' previous contract, with minimal changes, and that, as the next step, the Rubinsteins should come to BD's office in Boston to meet BD's other partners.

36.     On March 20, 2007, Maher and Berman contacted the Rubinsteins, and Maher informed them that she had spoken with her partners with regard to the Rubinsteins' requirement of a registered New York  law office for BD, that establishment of such an office was not an issue, and that this would be done as soon as possible.

37.     The Rubinsteins then met in person with the seven partners of BD's Boston office on March 22, 2007, at their office in Boston. Also present by speakerphone was Michael Pucillo from BD's Florida office.  DeValerio explained that, although they had scheduled the meeting for late morning so that Joseph Tabacco in BD's San Francisco office could also attend by speakerphone, Tabacco had a conflict and was not able to join in the discussions.

38.     During the March 22, 2007 meeting, the Rubinsteins discussed their client outreach achievements. The Rubinsteins again explained that a fully functioning in-house monitoring program with personnel capable of handling and understanding the data and needs of

international clients was a requirement for the Rubinsteins to form a contractual relationship with BD. BD again assured the Rubinsteins of the superior nature of their in-house monitoring program. The Rubinsteins also reiterated that it was a prerequisite to forming a contractual relationship that the BD firm open and maintain for the life of the contract a registered law office in Manhattan; BD agreed that it would do so promptly.

39.     Later that day, the Rubinsteins had a brief discussion with Leslie Stern ("Stern"), a partner in the BD Boston office, who Berman and Maher had stated was the head of the firm's in-house monitoring team. Stern briefly discussed and demonstrated her tracking of Bloomberg stock drops. Over time, the Rubinsteins observed that Stern would continue to exhibit confusion and lack of knowledge or ability with regard to her understanding of client data and the monitoring of trade data as to international clients, and on or about July 24, 2007, after repeated complaints by the Rubinsteins, DeValerio finally admitted that Stern "continues to remain mystified" as to the trading data.

40.     At neither the March 19, 2007 meeting in New York nor March 22, 2007 meeting in Boston did Berman and/or Block inform the Rubinsteins that BD was in fact comprised of three separate law firm entities, namely Berman DeValerio & Pease LLP, Berman DeValerio Pease & Tabacco P.C., and Burt & Pucillo LLP. Nor did they inform the Rubinsteins that BD&P and BDP&T represented that they were of counsel to each other, or any other features of the firm's true structure.

41.     On March 23, 2007, Berman opened a Manhattan office on behalf of the BD law firm at 410 Park Avenue through the management company of Manhattan Business Centers ("MBC"). Berman stated at that time, as he had in earlier conversations with the Rubinsteins, that this office would also serve as a place from which the Rubinsteins could file New York cases on behalf of BD. MBC agreed to provide a dedicated phone and fax number for the BD

24

firm and a live dedicated receptionist who would answer phones on behalf of the BD firm; conference room space and secretarial support staff were also to be made available to all BD personnel.

42.     Several meetings took place over the next few months in BD's Manhattan office, including a meeting in early April 2007 between Joseph Tabacco and the Rubinsteins, and a meeting on July 24, 2007, between the Rubinsteins and DeValerio.

43.     On March 25, 2007, the Rubinsteins sent an email to Maher and Berman reiterating the NY State Agency's requirement that the firm have a New York office, explaining that the firm had to be registered to do business in New York, and that the Rubinsteins would not contact the New York State Agency in regard to certain international initiatives then planned until the New York office was registered and appeared on BD's website.

44.     On March 26, 2007, the Rubinsteins received an email of an "of counsel" agreement signed by BD.  With BD's permission, one edit was made to the agreement by the Rubinsteins, a caveat to the six month termination clause, who then signed and, thus, accepted, the finalized agreement and sent it back to BD (the "Agreement"). The Agreement is attached as Exhibit "B".

45.     The Agreement required, *inter alia*, that BD cooperate with the Rubinsteins and, also, comply with all applicable laws, regulations and ethical requirements. The Agreement also required, implicitly or otherwise, that BD act in good faith at all times.

46.     On March 29, 2007, in an email to Maher and Berman, Rubinstein stated that the Rubinsteins would be designated as contacts for an International client. Rubinstein also stated that the Rubinsteins would put Stern in direct contact with the operational people at this client. Berman responded by stating "That makes sense. We have no problem with that."

47.     Also on March 29, 2007, Richard Lorant, BD's Director of Marketing and Client Relations, emailed the Rubinsteins a copy of the firm's custodial request direction letter to use for acquiring data from international clients' custodians.  However, the direction letter was inadequate and bereft of adequate descriptive details concerning data necessary for portfolio monitoring.

48.     On March 30, 2007, the Rubinsteins sent an email to Berman and Maher asking "when will our names and the New York office will be added to the website?"

49.     On April 2, 2007, the Rubinsteins sent an email to Berman, Maher, DeValerio, and Stern detailing the Rubinsteins' progress with certain clients.

50.     On April 3, 2007, the Rubinsteins sent an email to Maher again asking "when will our bios and the New York office are going up on the website?"

51.     On April 18, 2007, the Rubinsteins met in Boston with several of BD's partners. Stern also advised the Rubinsteins for the first time that the firm used Verteris, an outside monitoring service, and she warned the Rubinsteins never to use or reveal the name Verteris with/to clients, and that this was a firm policy.  The Rubinsteins were told that BD wanted clients to think that all monitoring work was done in-house and, also, to think that the firm had a full service, in-house monitoring department.

52.     The Rubinsteins later discussed with BD the need to customize or enhance BD's online monitoring interface to better address the unique needs of international clients, but BD resisted.  The Rubinsteins were told that the generic Verteris service was used without any enhancements.  Despite the Rubinsteins' offer of assistance with this and advice that enhancements to the program be utilized to benefit international institutional investor clients, the firm stated that it did not wish to expend additional effort or expense to make any modifications to Verteris' generic service.

53.     The Rubinsteins also informed BD that a number of plaintiffs securities class action firms that utilized the services of Verteris used it to enhance their own in-house monitoring capabilities, and that some of these law firms disclosed on their public website their use of Verteris.  However, despite this, BD continued in its refusal to cooperate in implementing enhancements, and it continued to insist that Verteris be kept a secret from clients.

54.     On April 25, 2007, Berman sent an email to the Rubinsteins, copying Maher, in which he discussed the completion of paperwork for the NY State Agency application on behalf of BD.  This email was in response to an email sent that morning from the Rubinsteins to Berman and Maher, wherein Rubinstein stated that the New York State Agency must deal with BD's New York office.

55.     On April 25, 2007, Rubinstein sent an email to Manhattan Business Center.  The email stated that paperwork would be fedexed to MBC from Furlong, Pennsylvania, and that checks would be fedexed from Boston, for the purpose of applying from the New York office of BD for assistance from the New York State Agency.  MBC's instructions were to combine both of these and have them delivered to the New York State Agency from BD's New York office.

56.     Also on April 25, 2007, the Rubinsteins engaged in a phone conference with Berman and Maher, who stated that they wanted the Rubinsteins to consider creating an LLC in New York for the benefit of BD and register the LLC in their (the Rubinsteins') names, without revealing or mentioning BD.  According to Berman and Maher, the Rubinsteins' LLC could then make all necessary filings and interactions in New York, including any contacts or interactions with any New York governmental agencies.

57.     When asked the reason for this, Maher and Berman stated that BD had in the past and currently was prosecuting class action cases in New York and that, as a result, there was an issue of New York tax liability. They explained that the creation of an LLC by the Rubinsteins in

their names only would help BD avoid its tax liability in New York by enabling BD to avoid a profile through any public filings with any government agencies. Berman stated that the offices of the firm, in Boston, San Francisco, and Florida, entered into arrangements/entities similar to the type he proposed that the Rubinsteins create.

58.     The Rubinsteins responded that the existence of a New York office should not be a factor in whether or not BD had tax liability to New York because the law firm would owe the taxes as a consequence of work done in New York irrespective of the existence of an office there. Berman and Maher then explained that the firm had as recently as early 2007 received "large hits [recoveries] in New York" from cases worked there which, in itself, would likely result in tax liability "in the hundreds of thousands of dollars," and, therefore, the firm wished to "stay under the radar" in New York, and that this could best be accomplished through the creation of an LLC as suggested by them.  The Rubinsteins responded that this did not sound right.

59.     On April 25, 2007, Rubinstein sent another email to MBC stating that the checks from Boston would not be arriving the next day but, rather, probably not until the following week. When the Rubinsteins protested this delay to Berman, he admitted that BD was not ready to apply to the New York State Agency until the New York office issue was resolved.

60.     In an April 26, 2007 conference call with Berman and Maher, the Rubinsteins again declined to file the application for assistance with the New York State Agency under their own names without the BD law firm, which BD again stated would let BD "stay under the radar." Berman and Maher again brought up the idea of the Rubinsteins' establishment of an LLC in their names in New York. Again, the Rubinsteins declined BD's suggestion and expressed concern as to the legality and ethics of BD's suggestion.

61.     After the above conversations with Maher and Berman, the Rubinsteins sought an independent opinion as to the propriety of opening an LLC in their names in New York.  As memorialized in part in an email to Berman and Maher from Rubinstein on May 4, 2007, based on the Rubinsteins' reservations and the independent opinion obtained, they unequivocally opposed having an LLC in their names because the purpose of doing so was, according to BD, to enable them (BD) to "stay under the radar" and avoid or evade tax liability in New York.

62.     In addition, prior to execution of the Agreement, BD had maintained a website with a grid face showing BD's three offices in Boston, West Palm Beach, and San Francisco, and listing the attorneys at each office under a heading for each office.

63.     Shortly after execution of the Agreement, the Rubinsteins advised BD to add them to the attorney listings on the firm's website under a heading listing the firm's New York office.  BD suggested instead that the Rubinsteins be listed on a separate section of the website, separate from the firm's attorneys, devoted exclusively to international outreach efforts.  The Rubinsteins objected to this and advised BD that the New York office needed to be added to the office listings throughout the firm's website, wherever BD's offices or locations were listed.

64.     Thereafter, BD instead decided on its own to change the face of the grid on the attorney bio section of the website to remove any reference to BD's offices or addresses, resulting in a listing of attorneys for the attorney bio section of the website without identifying or disclosing any office locations or addresses on the face of the grid.  At the same time, the Rubinsteins were added to BD's website in an "of counsel" column, without a reference to or disclosure of an office location, address, or phone number, and with only a general reference to the Rubinsteins being of counsel in New York.  No BD New York office was disclosed.

65.     BD subsequently advised the Rubinsteins that photos would be taken to add to the attorney bio section of the firm's website.

66.     Around the same time, the Rubinsteins spoke to Maher about the website changes noted above.  The Rubinsteins stated that the website changes were not as requested and, also would undermine their efforts to successfully perform the Agreement. Maher responded that the website was changed by BD so that those who viewed the website could not tell where the attorneys were located without an additional hyperlink to individual attorney bios on separate web pages.  The Rubinsteins complained that the website, as modified by BD, was bereft of any reference to a New York office of BD.

67.     After photos were taken for the attorney bio section of the firm's website, sometime in or about May, 2007, when the photos were added to the website, office addresses and phone numbers for each attorney were added next to each photo, except that, when the Rubinsteins' photos were added to their bios listing them as "of counsel in New York," it was without any office address or phone number, and without any disclosure that BD had a New York office.

68.     The Rubinsteins complained to Berman about the inadequacy of their listing in the firm's website and the lack of an office address for them or BD in New York.

69.     Subsequently, the checks for the New York State Agency were sent by BD and the application to the Agency was filed, but not until May 30, 2007. During this time, Berman continued to stall the Rubinsteins regarding proper acknowledgment or listing of BD's New York office on the firm's website, stating that this acknowledgment was imminent but that, in addition to tax liability concerns, the partners had to make a decision in terms of style and placement on the firm's website.

70.     The Rubinsteins' relationship with Berman and Maher gradually began to deteriorate after the Rubinsteins' rejection of Berman and Maher's request that the Rubinsteins establish an LLC in New York so that BD could "stay under the radar" in New York.  The

relationship also gradually continued to deteriorate as these two partners continued to stall regarding the registration and legitimate establishment of the firm's New York office, while, at the same time, they continued to pressure the Rubinsteins to bring in their clients' confidential trade data and demanded to meet the same clients.

71.     Disclosure of BD's New York office was included in a draft of a new marketing brochure that was to be used for international and domestic purposes according to a May 14, 2007 email from Maggie Carlson ("Carlson"), BD's Marketing Manager.  This inclusion was the result of efforts by the Rubinsteins along with Carlson and Richard Lorant, the firm's director of marketing.  On May 22, 2007, Carlson stated in another email that she was giving the brochure "to Norm [Berman] and Kathleen [Maher] to review."

72.     Subsequently, Berman, Maher and/or Carlson continued to mislead the Rubinsteins by informing them that the brochure would be completed over time, but that they were busy with other matters, and that BD wished to have one universal brochure to be utilized for both domestic and international clients. However, ultimately, Carlson admitted to the Rubinsteins that the firm did not want a brochure disclosing a New York office to be disseminated for domestic use and, therefore, the brochure was never approved to the Rubinsteins' knowledge.

73.     The lack of a proper listing of the New York office on BD's website also was questioned repeatedly by certain of the Rubinsteins' contacts and/or clients.  Contacts in several countries continued to press the Rubinsteins to supply them with marketing brochures to effectively aid the Rubinsteins in their client development efforts. Both the lack of proper acknowledgment or listing of BD's New York office on the firm's website and the firm's refusal to supply the Rubinsteins with marketing brochures disclosing the New York office were

ongoing impediments which deprived the Rubinsteins of the ability to effectively perform their services under the Agreement and interfered with their client development efforts overseas.

74.     The Rubinsteins expressly informed BD that the firm's bad faith and lack of cooperation and compliance, not to mention its attempts to evade New York law and tax reporting and payment requirements, were interfering with and negatively impacting the Rubinsteins' ability to successfully perform under the Agreement.

75.     As stated above, when Berman and Maher requested that the Rubinsteins create an LLC for the benefit of Berman DeValerio Pease Tabacco Burt & Pucillo, Berman stated that the other offices had entered into similar arrangements.

76.     In June and July 2007, the Rubinsteins had ongoing communications by phone and email with Stern, Berman, and Maher regarding an issue related to the data download from certain clients.  The Rubinsteins stated that they would set up a phone conference with Stern during a meeting on July 5, 2007 with one of the Israeli clients. Stern, however, supposedly the head of BD's monitoring program and the one allegedly most knowledgeable with regard to the program, did not participate in the call, which was consistent with her comments that she did not understand the data download issues concerning the local custodian banks in a foreign country. For example, she asked repeatedly for a definition of "local custodian," ultimately requesting that the issue be defined by the Rubinsteins in writing to her before including the firm's "data expert" in any conference call with the foreign clients.

77.     It was not until July 24, 2007, that the Rubinsteins learned from DeValerio that the firm's "data expert" was actually an outside consultant (Dan Shinnick) who worked for Verteris, BD's outside monitoring service provider.

78.     In an email dated July 18, 2007, the Rubinsteins advised DeValerio that the six month termination option of the Agreement was approaching and that they had received an

invitation to work with their prior law firm. In an effort to work things out, the Rubinsteins asked to speak with DeValerio directly.

79.     On July 19, 2007, the Rubinsteins sent an email to DeValerio in which they stated, in relevant part, "we need to resolve this issue of the NYC office. Before we agreed to come on board Kathleen [Maher] and Norm [Berman] proclaimed to us that it is not an issue. We still don't have a New York office as it is referred to nowhere on your website and this fact continues to be pointed out to us by contacts and clients. If we are to continue to perform client outreach for this firm we need the NYC office on the website."

80.     DeValerio agreed to meet with the Rubinsteins on July 24, 2007 in BD's New York office. On July 22, 2007 the Rubinsteins emailed DeValerio a memo describing their client development efforts to date. At the meeting on July 24, 2007, DeValerio stated that there was still refusal within the firm to complete the requirements for a legitimate, publicly acknowledged New York office because of tax liability concerns.  DeValerio further stated, as had Berman and Maher, that BD wished to "stay under the radar" in New York because, just based on the business in New York that year, (2007), "hundreds of thousands of dollars" of tax liability was at issue.

81.     In regard to the ongoing data download issue with certain international clients, DeValerio stated that Stern remained "mystified" and did not comprehend the data download issues which necessarily preceded the monitoring process.

82.     DeValerio requested that the Rubinsteins schedule a conference call between Dan Shinnick of Verteris and certain foreign clients to address the data download issues.  DeValerio also stated that the foreign clients were not to be made aware of Shinnick's position within the Verteris company, but, rather, were to be led to believe that Shinnick was an employee of BD.

The Rubinsteins refused to mislead clients about Shinnick's status, believing that this was improper and unethical.

83.     The Rubinsteins insisted that they could not continue their client development efforts under these circumstances, which included BD's bad faith, lack of cooperation, improper efforts to deceive clients, and evade requirements of New York state law, and that these issues would have to be resolved so that a legitimate New York office would and could exist and be properly registered.  DeValerio stated that he would meet with his partners to work on the New York office issue and requested that, in the meantime, the Rubinsteins send him by email a "list of needs" necessary to continue their client development efforts. The Rubinsteins sent DeValerio the requested list by email on July 25, 2007. Featured first on this list was the need for the firm to acknowledge/list BD's New York office on the firm's website and marketing materials.

84.     Also included in the Rubinsteins' list of needs email to BD was their request, originally made in late June 2007, to post on the firm's website a favorable feature article published in Ireland, the draft of which Maher had pre-approved, which the Rubinsteins stated would help them in their performance of the Agreement.  However, Berman subsequently informed the Rubinsteins that the firm did not want to post the article on its website because, despite Maher's approval of the draft, the author included in the article a last minute reference to Boltz as resident in BD's Manhattan office.

85.     On July 25, 2007, DeValerio sent the Rubinsteins an email stating that the meeting with his partners went "generally well" and that his partners "agreed to most of what I proposed." Rather than explaining any further, DeValerio stated that he would get back to the Rubinsteins when his hectic schedule cleared up.

86.     It was not until one week later, on August 1, 2007, that DeValerio phoned Rubinstein. DeValerio stated that he wanted to speak with Rubinstein before he authorized the

wire transfer of the Rubinsteins' paycheck, due that day. DeValerio stated that Berman was working on the July 25 list of needs email, including doing what was necessary to assure that the firm's New York office was legitimately registered and publicly acknowledged, and that Berman was working with other partners on this and awaiting feedback from them.  DeValerio promised to update the Rubinsteins soon in that regard. DeValerio also stated that "what I want from you now" is to hasten the download of certain clients' trade data and to schedule meetings for him with clients in two countries at the end of August or September.

87.     On or about August 20, 2007, DeValerio phoned Rubinstein and stated that everything had been completed in regard to the New York office and all that remained were questions of style for placement on the website. When Rubinstein raised the question of properly registering the office in New York, DeValerio said the paperwork was all done and that registration would be filed once the website style issues were resolved.

88.     Given BD's continued delay, the Rubinsteins conducted their own investigation of the firm structure and learned the following:

(a)     The entity that they had contracted with - "Berman DeValerio Pease Tabacco Burt & Pucillo" – was/is not a registered legal entity in Massachusetts;

(b)     there was/is no fictitious name registration for "Berman DeValerio Pease Tabacco Burt & Pucillo" in Massachusetts;

(c)     there was/is no business certificate for "Berman DeValerio Pease Tabacco Burt & Pucillo" in Massachusetts;

(d)     there was/is a "Berman, DeValerio & Pease, LLP"  listed as an active professional limited liability partnership registered in the Commonwealth of Massachusetts;

(e)     for at least the five years prior to the contract formation at issue, two named partners, Norman Berman and Glen DeValerio, authored and certified Annual Reports on behalf of the firm partners of "Berman DeValerio & Pease, LLP";

(f)     the annual reports, e) above,  authored by Berman and/or DeValerio, are on letterhead of "Berman DeValerio & Pease, LLP" listing "Berman DeValerio Pease & Tabacco, P.C." as "Of Counsel";

(g)     the annual reports, e) above,  authored by Berman and/or DeValerio, do/did not mention "Berman DeValerio Pease Tabacco Burt & Pucillo";

(h)     the annual reports, e) above, authored by Berman and/or DeValerio, do/did not mention purported named partners Burt and/or Pucillo of "Berman DeValerio Pease Tabacco Burt & Pucillo";

(i)      "Berman DeValerio Pease & Tabacco, P.C." was/is an active (since September 7, 1995) California professional corporation in San Francisco, CA;

(j)     the corporate filings of  "Berman DeValerio Pease & Tabacco, P.C."  did/do not mention "Berman DeValerio Pease Tabacco Burt & Pucillo";

(k)     the corporate filings of "Berman DeValerio Pease & Tabacco, P.C."  did/do not mention Burt and/or Pucillo  the purported partners of "Berman DeValerio Pease Tabacco Burt & Pucillo";

(l)      the corporate filings of "Berman DeValerio Pease & Tabacco, P.C." were/are bereft of any mention of  Norman Berman, Glen DeValerio, or Peter Pease;

(m)      Burt & Pucillo, LLP was/is a registered limited liability partnership in the State of Florida;

(n)     from 2002 to 2007 the owners of a fictitious name "Berman DeValerio Pease Tabacco Burt & Pucillo" registered in Palm Beach, Florida had been C. Oliver Burt and Michael J Pucillo;

(o)     in supporting documents attached as exhibits to a sworn affidavit of Joseph Tabacco,  the purported managing partner of "Berman DeValerio Pease & Tabacco, P.C.",  addressed to the Honorable Lewis A. Kaplan, United States District Court for the Southern District of New York, Tabacco stated that "Berman DeValerio & Pease, LLP" was/is "Of Counsel" to   "Berman DeValerio Pease & Tabacco, P.C." (In Re Auction House Antitrust Litigation (Master File No 00 Civ 0648 (LAK)).

89.     Given BD's continued misconduct, deceptions, and breaches, the Rubinsteins, having determined that BD had not complied and would not comply with their contractual obligations or New York law, decided to accept an offer made late in the evening of August 31, 2007 by their previous law firm requiring them to begin work "of counsel" on September 1, 2007, at a fixed rate plus expenses, with the option for a future contractual relationship of a similar nature.

90.     As late as September 10, 2007, despite BD's representations and promises upon receipt of the Rubinsteins' July 25, 2007 list of needs email, the Rubinsteins had still not received any substantive response or any meaningful follow-up after Rubinstein's conversation with DeValerio on or about August 20, 2007. BD had not and did not further communicate concerning proper disclosure or placement of BD's New York office on the firm's website and marketing brochures; nor did BD do anything to obviate the Rubinsteins' concerns over BD's continued stated desire to "stay under the radar" of the New York tax authorities.

91.     As a result of BD's continued bad faith, deceptive conduct as to clients and the New York tax authorities, misrepresentations, failure/refusal to cooperate with the Rubinsteins, the failure/refusal to have, maintain, or provide a sufficient in-house monitoring program, with knowledgeable and competent personnel and the refusal to comply with applicable laws and regulations, as well as ethical requirements, all of which alone or combined constituted material breaches of the Agreement, the Rubinsteins were forced to formally terminate the Agreement by notice sent to DeValerio on September 10, 2007.

92.     The Rubinsteins informed BD in their September 10, 2007 termination letter that they were represented by counsel.  The letter set forth Charles J. Weiss, Esquire as the Rubinsteins' counsel and provided contact information for Mr. Weiss. The Rubinsteins requested that any further communications regarding this matter be directed to Mr. Weiss.

93.     DeValerio, on behalf of BD, nevertheless sent a letter dated September 12, 2007, to the Rubinsteins, Mr. Weiss, and two named partners at the Rubinsteins' new law firm. In that letter, BD accused the Rubinsteins of, *inter alia*, unprofessional conduct, deception, egregious misconduct, breach(es) of the Agreement, and improper badgering for payment of salary. The letter was/is not privileged. The statements in the letter accusing the Rubinsteins of improper, misleading, deceptive, or unprofessional conduct were/are false and DeValerio knew such statements were false.  This letter is attached and incorporated by reference as Exhibit "C".

94.     BD's primary, if not sole, purpose in sending this letter to the Rubinsteins' new law firm was to defame the Rubinsteins by ruining or damaging their character and reputations among firms handling securities class actions and to interfere with, induce, and encourage the Rubinsteins' new law firm to terminate the Rubinsteins' existing contractual relationship with that firm and/or the Rubinsteins' prospective contractual or other business relations with that firm as well as others.

95.     BD had no justification or privilege to send or disseminate this letter (Exhibit "C") to the Rubinsteins' new law firm.  The communication to the new law firm was in bad faith and was not necessary to protect or vindicate any real or legitimate right, claim, interest, or concern of BD.  Moreover, even if, theoretically, BD was privileged or justified in sending this letter to the Rubinsteins' new law firm, the privilege or justification was abused because, *inter alia*, the letter was/is knowingly false and defamatory, and, as noted, any such communication to the Rubinsteins' new law firm was unnecessary.

96.     On September 17, 2007, Rubinstein emailed a copy of the Rubinsteins' letter of resignation/termination of September 10, 2007 to Darren Robbins, a named partner at their new law firm, at Robbins' request after Robbins had received a copy of BD's September 12, 2007 letter from BD.

97.     On September 18, 2007, DeValerio, on behalf of BD, sent a letter to Weiss in which BD acknowledged that they had sent their September 12, 2007 letter with knowledge that the Rubinsteins were represented by Weiss and that they had sent the letter despite having said knowledge.

## COUNT I

## BREACH OF CONTRACT

98.     The Rubinsteins repeat and incorporate by reference the allegations contained in Paragraphs 1 through 97 of the Counterclaim as if fully set forth herein.

99.     BD materially breached the Agreement with the Rubinsteins as follows:

(a)     Acting in bad faith; for example, without limitation, by attempting to deceive and/or attempting to induce the Rubinsteins to deceive clients and the state/city of New York, specifically the New York Department of Tax and Finance, including efforts to get the Rubinsteins to cover for BD's efforts to violate New York law and tax reporting and payment obligations, concealing, until much later, their use and reliance

upon independent monitoring services, such as Verteris, misrepresenting the sufficiency, competence, and capabilities of their alleged in-house monitoring program, and personnel, and repeated misrepresentations to the Rubinsteins during the course of the Agreement;

(b)     failing/refusing to cooperate and support the Rubinsteins' Agreement performance by, *inter alia*, the actions set forth in subparagraph (a) above, failing/refusing to have, maintain, or provide competent and sufficient in-house monitoring services and/or personnel, and failing/refusing to properly list or disclose BD's New York office on its website and in its marketing materials; and

(c)     violating the requirements of good faith and cooperation, and their contractual duty to comply with all laws, regulations, and ethical requirements, by reason of their conduct and/or omissions set forth in subparagraphs (a) and (b) above and, also, in failing/refusing to open or establish a legitimate, registered, publicly acknowledged New York office of BD, particularly insofar as the New York tax authorities are concerned.

100.     By reason of the foregoing, the Rubinsteins were discharged from any further contractual obligations to BD or duty to perform under the Agreement, and they were entitled to formally terminate same and to seek other employment or contractual relations.

101.     By reason of the foregoing, the Rubinsteins have sustained a loss of expected income in the sum of at least One Hundred Fifty Thousand Dollars ($150,000.00), together with future expected losses of income and, perhaps, other consequential damages as well.

## COUNT II

### BREACH OF COVENANT OF GOOD AND FAIR DEALING

102.   The Rubinsteins repeat and incorporate by reference the allegations contained in Paragraphs 1 through 101 of the Counterclaim as if fully set forth herein.

103.   Implied in every contract is the covenant of good faith and fair dealing in its performance or enforcement.

104.   BD breached its obligation to carry out the Agreement in good faith by the following:

(a)   Acting in bad faith; for example, without limitation, by attempting to deceive and/or attempting to induce the Rubinsteins to deceive clients and the state/city of New York, specifically the New York Department of Tax and Finance, including efforts to get the Rubinsteins to cover for BD's efforts to violate New York law and tax reporting and payment obligations, concealing, until much later, their use and reliance upon independent monitoring services, such as Verteris, misrepresenting the sufficiency, competence, and capabilities of their alleged in-house monitoring program, and personnel, and repeated misrepresentations to the Rubinsteins during the course of the Agreement;

(b)   failing/refusing to cooperate and support the Rubinsteins' Agreement performance by, *inter alia*, the actions set forth in subparagraph (a) above, failing/refusing to have, maintain, or provide competent and sufficient in-house monitoring services and/or personnel, and failing/refusing to properly list or disclose BD's New York office on its website and in its marketing materials; and

(c)   violating the requirements of good faith and cooperation, and their contractual duty to comply with all laws, regulations, and ethical requirements, by reason

41

of their conduct and/or omissions set forth in subparagraphs (a) and (b) above and, also, in failing/refusing to open or establish a legitimate, registered, publicly acknowledged New York office of BD, particularly insofar as the New York tax authorities are concerned.

105.    As a direct and proximate result of the defendants-in-counterclaim breach of the implied covenant of good faith and fair dealing, the Rubinsteins have sustained or likely will sustain the damages set forth in paragraph 101 hereof.

**COUNT III**

**DEFAMATION**

106.    The Rubinsteins repeat and incorporate by reference the allegations contained in Paragraphs 1 through 105 of the Counterclaim as if fully set forth herein.

107.    On information and belief, the statements by DeValerio, acting on behalf of BD, in his letter of September 12, 2007 (Exhibit "C") were made within the course and scope of his duties and authority as a Managing Partner and authorized representative of BD, with the knowledge of all BD.

108.    DeValerio's letter was sent to and received by the Rubinsteins' new law firm without consent, privilege, or justification for doing so.

109.    BD's letter, without limitation as to the entire scope of the defamatory and false meanings contained therein, was defamatory as to the Rubinsteins and was intended to and did in fact convey to the recipients thereof, either expressly or by implication, that the Rubinsteins, and only the Rubinsteins, in the course of their Agreement with BD, were deceptive in their profession and business, engaged in egregious, unprofessional and/or unethical misconduct in their profession and business, and that they (the Rubinsteins) ultimately breached the Agreement with BD by reason of such conduct.

GSDOCS\1816376

110.     BD's letter, which was unnecessary and without justification sent to the Rubinsteins' law firm, was intentionally, willfully, and maliciously published to the Rubinsteins' new law firm for the specific purpose of damaging the Rubinsteins' character and professional reputations and, thus, their ability to develop successful contractual relations with clients and/or other law firms.

111.     BD's letter was sent with knowledge that the claims, accusations, and statements as to the Rubinsteins, and the misconduct attributed to them, were false or was sent in reckless disregard for the truth or falsity of same.

112.     BD's letter was understood by the persons who received it, including, but not limited to, the two named partners of the Rubinsteins' new law firm identified in BD's letter, as being defamatory in nature and intent.

113.     Even if, theoretically, BD had a privilege or justification for sending its letter to the Rubinsteins' new law firm, the privilege or justification was abused under the circumstances.

114.     Defendant's statements were/are actionable and defamatory per se.  In addition, the Rubinsteins have sustained or likely will sustain the damages set forth in paragraphs 119-120, 128-130 hereof, as well as significant damage to their business, livelihood, and professional and personal character and reputations, which damage will likely continue for an indefinite time in the future.

115.     As a further direct and proximate result of the false and malicious statements of BD, as aforesaid, the Rubinsteins have suffered and will likely continue to suffer for an indefinite time in the future pain and suffering and emotional distress, and personal and professional embarrassment and humiliation, as well as serious and irreparable injury to their names and reputations.

116.     BD's actions, as aforesaid, were intentional, malicious, outrageous, and in reckless disregard of the Rubinsteins' rights and interests, and were designed specifically to harm them personally and to destroy or substantially diminish their ability to earn a living in their chosen profession.

## COUNT IV

## INTENTIONAL INTERFERENCE WITH PLAINTIFFS-IN-COUNTERCLAIM ACTUAL AND/OR PROSPECTIVE BUSINESS RELATIONS AND CONTRACTS

117.     The Rubinsteins repeat and incorporate by reference the allegations contained in Paragraphs 1 through 116 of the Counterclaim as if fully set forth herein.

118.     BD intentionally, improperly, and without privilege or justification tortiously interfered with the Rubinsteins' existing and prospective contractual relations with their new law firm by, *inter alia*, inducing them or otherwise causing them not to perform their agreement(s) and/or prospective agreement(s) with the Rubinsteins.

119.     As a direct and proximate result of BD's unlawful intentional interference with the Rubinsteins' existing and prospective business and contractual relations, as aforesaid, the Rubinsteins have likely been severely damaged in their ability to maintain, perform, or continue performing existing contracts and/or in obtaining, maintaining, performing, and continuing to perform prospective contracts with their new law firm and/or other securities class action law firms, and other law firms as well, which will likely result in substantial financial injury and harm including, but not limited to, loss of income and business and financial opportunities.

120.     As a further direct and proximate result of the false and malicious statements of BD, as aforesaid, the Rubinsteins have suffered and will likely continue to suffer for an indefinite time in the future pain and suffering and emotional distress, and personal and professional embarrassment and humiliation, as well as serious and irreparable injury to their names and reputations.

44

121.     BD's actions were intentional, malicious, outrageous, and in reckless disregard of the Rubinsteins' rights and interests, and were designed specifically to harm the Rubinsteins personally and destroy or substantially diminish their ability to earn a living in their chosen profession.

**COUNT V**

**FRAUDULENT INDUCEMENT**

122.     The Rubinsteins repeat and incorporate by reference the allegations contained in Paragraphs 1 through 121 of the Counterclaim as if fully set forth herein.

123.     The Rubinsteins were fraudulently induced to enter into the Agreement (Exhibit "B") with BD.

124.     BD's fraudulent inducement consisted of the following knowing, intentional, and malicious material false statements of fact or intention and/or concealments, which were designed to induce the Rubinsteins to enter into the Agreement with BD:

(a)     BD's stated intent and contractual promise to cooperate with the Rubinsteins and to comply with their requirements for successful development and retention of international institutional investor clients, who, BD knew, the Rubinsteins intended to produce for the purpose of their signing up with BD for their monitoring program; BD at all times had no intent to cooperate as required, promised, or contemplated by the Agreement;

(b)     BD's stated intent and contractual promise to open/establish and register a legitimate New York office; BD at all times had no intent to cooperate in this regard, act in good faith, or to establish a legitimate, registered office as promised or contemplated by the Agreement since, *inter alia*, their real goal, first revealed to the Rubinsteins post-Agreement, was to deceive clients and contacts into believing that they had a legitimate New York office while at the same time keeping the office hidden from New York tax authorities, specifically

the New York Department of Tax and Finance, in order to facilitate their violations of New

York law and tax reporting and payment obligations;

(c)     BD's stated intent and contractual promise to comply with all laws,

regulations, and ethical requirements, as evidenced by, *inter alia*, the facts alleged in

subparagraph (b) above, BD's past and ongoing violations of New York law and tax

reporting and payment obligations, which had occurred prior to and at the time the

Agreement was executed, and BD's post-execution conduct including, for example, their

continued failure and refusal to disclose their New York office as BD's office, as repeatedly

requested by the Rubinsteins, on their website or marketing materials;

(d)     BD's representations that they had a unique and superior in-house

monitoring program that would be used under the Agreement and that this program was

more than sufficient for the Agreement and would be run by competent and knowledgeable

personnel, specifically Leslie Stern; BD knew at all times, and did not reveal to the

Rubinsteins until after execution of the Agreement, that they regularly utilized and intended

to utilize a generic version (without enhancements) of Verteris, an independent monitoring

service, and that Stern was incapable of understanding or administering the data from

international clients.

125.     BD knew or recklessly disregarded the fact that the foregoing misrepresentations

and/or concealments were false and that they were intentionally made or omitted in order to

deceive the Rubinsteins so as to induce them to rely upon same for the purpose of executing the

Agreement (Exhibit "B").

126.     BD's misrepresentations/concealments were material to the Agreement herein,

and BD knew this, based on, inter alia, their (BD's) experience and past practices and, also,

information provided and statements made to them prior to execution of the Agreement by the

Rubinsteins related to the significance of, *inter alia*, (a) BD's cooperation needed for successful performance of the Agreement and the Rubinsteins' ability to produce international institutional investor clients for BD, (b) BD's need to have a sufficient in-house monitoring program run by knowledgeable and competent personnel, and (c) BD's need to have a registered, legitimate New York office of BD.

127.    Prior to executing the Agreement, the Rubinsteins believed BD's statements, representations, and promises and, in justifiable reliance thereon, executed the Agreement (Exhibit "B") based on same.  If the Rubinsteins had known that BD's statements, representations, inducements, and promises were false, as stated above, they would not have entered into the Agreement, or any contract, with BD.

128.    As a proximate result of BD's fraudulent inducement, the Rubinsteins have suffered damages to their professional reputations, the possible loss of clients, other contract opportunities that likely would otherwise have developed, and, as a result, they have likely sustained a permanent impairment of their earnings and/or earning power.

129.    As a further direct and proximate result of BD's fraudulent inducement, the Rubinsteins have suffered and will likely continue to suffer for an indefinite time in the future pain and suffering and emotional distress, and personal and professional embarrassment and humiliation, as well as serious and irreparable injury to their names and reputations.

130.    BD's actions were intentional, malicious, outrageous, and in reckless disregard of the Rubinsteins' rights and interests; BD knew, or recklessly disregarded the fact, that the Rubinsteins would be harmed and that their reputations, credibility, relations with international clients, and ability to earn a living in their chosen profession would be destroyed or diminished because of BD's actions.

WHEREFORE, the Rubinsteins respectfully request that this Court:

1.      Enter judgment in the Rubinsteins' favor and against the defendants-in-

counterclaim on all Counts of the Counterclaim;

2.      Award damages to the Rubinsteins in an amount to be determined at trial; and,

3.      Order such other and further relief as is just.

### JURY DEMAND

The Rubinsteins demand a trial by jury on all issues so triable as set forth in their

Counterclaim.


ERAN RUBINSTEIN and SUSAN M. BOLTZ
RUBINSTEIN,

Respectfully submitted,
By their attorneys


/s/ Neil V. McKittrick _____
Neil V. McKittrick (BBO# 551386)
Elizabeth L. Schnairsohn (BBO# 658532)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, Massachusetts 02110-3333
Telephone:  (617) 482-1776
Facsimile:  (617) 574-4112
nmkittrick@goulstonstorrs.com
eschnairsohn@goulstonstorrs.com


Dated:  March 27, 2008

### CERTIFICATE OF SERVICE


I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
on March 27, 2008.

/s/  Neil V. McKittrick
Neil V. McKittrick

GSDOCS\1816376